May it please the Court, I'm Alan Escovitch, and it's my privilege to represent Bozovic Marine in this appeal. And having gone back over this record and having gone back over the briefs, I was trying to figure out really the best place to start. And what really struck me today as it did when I first read the record on appeal is the finding that the judge made was that Mr. dePerrodil in this maritime case knew that he maybe should have gone below the deck in order to take care of himself. And that's why she found him comparatively at fault. But then as I continued reading, I realized that everything in this case, almost every fact in this case is virtually undisputed. The facts are not really in dispute. What we get down to is the legal standard that was, in our view, misapplied and or misapprehended by the trial judge in this case. So we know that Mr. dePerrodil, who was a guest passenger on a crew boat, as he had been 40 or 50 times before over his career, he knew the sea was rough. He knew the vessel was bouncing around. In fact, it was Mr. dePerrodil, not the captain, but Mr. dePerrodil, the plaintiff, who said, you know, these seas are too rough. I can't even do the job I've gone out to do. Please turn around. Let's go back aboard. So that... Didn't the captain also tell him just to hold on? Hold on. It's going to be rough. Did he hold on to anything? Well, he did, Your Honor. He held on. Apparently he held on to a frame or a door frame, and then after two or three waves, this other wave came, the boat fell into a trough, and he lost his grip. So he was also asked by the plaintiff himself, why didn't you go below? He said, I wasn't going to try. We were bouncing and going too good. It was a bouncy ride, and he knew it from the time they hit the gulf all the way through the rest of it. One of the points that the negligence is said to rest on is that your client should have given instructions for him to go below before the turnaround and hitting the rougher seas, going that direction. What about that? Well, actually, Your Honor, that's not actually what was said. There's no indication by the judge or anywhere that he should have done it before he made the turn. That may be something implied. It may be something that people are interpreting, but there was nothing said by the judge. Before you turn around, you should have gone below. I don't believe that's true. But he did say, as he was turning, hold on, it's going to be rough. And Mr. DePardoe knew that it was going to be rough. He knew it. He'd been out there so many times. He'd seen rough seas before. He knew when you go into the wind, it's rougher. These are things that he knew. Mr. DePardoe may not have been a captain of a vessel, but he was very well versed in the ways of the sea.  According to the briefs, I mean, he said on his way out several times, I mean, I'm experienced at this. I know rough seas. I'm not afraid of rough seas. I know how to conduct myself in rough seas and so on. That's exactly it, Your Honor. This man knew as well as anybody. This is not a 13-year-old teenager going out on a day cruise for the first time. It's not people going out on a ferry like they did in the Catalina case. This is a guy whose life was based upon going out to sea to make money. That was his job. He was picked for this job to go out to the rig because he goes out to sea all the time. So this is not a surprising thing for Mr. DePardoe. The court, in its conclusion that he should be comparatively at fault, has said he should have done what the plaintiff is now arguing Captain Bozovic should have told him to do. What he's basically saying is, I knew all this, but he should have told me anyway. That's not the law. What would have happened, though? I mean, if he had gone below, why would he have not potentially suffered the same sort of injury? Well, that's the good question, Your Honor, because one of the cases cited by the plaintiff, which I believe is the McCall v. Williams or Williams v. McCall boat rentals, the man was actually in the passenger area in the seat when the wave hit him and he fell out of his seat. So we don't know. That wasn't tried. There was no expert testimony, factual testimony, or any evidence whatsoever as to what may or may not have happened had he been below in the first place. We don't know that. That's all hypotheticals and guessing, which we don't want to get into here. But we do know that Mr. DePerdil said. Well, I mean, the mere fact that he stayed in the, what do you call it, the wheel area? In the wheelhouse, yes, Your Honor. The wheelhouse. The wheelhouse, instead of going below, is an insignificant factor here. To my view, it is. The same result is as if it happened or not. It could be. It could be. To my view, it is. It hasn't been proven that it would have been any different. So you didn't put on any evidence at trial about how the going below, whatever that meant, how that might have been safer for him. Well, Captain Bozovic certainly did not, and the plaintiff did not either. It becomes a guessing game. It's like, well, maybe it would have been safer. We don't know that it would have been. I mean, we know that going out, going out before we even noticed it. So you just paid your money and took your chances. You didn't put on any evidence about it that it would not have been safer. So you, as we say, you just sort of laid behind the log. Well, I wouldn't have quite put it that way. Well, it was a tactical decision on your part. That's correct, Your Honor. There was no evidence. I don't know if there could have been evidence developed that would have said it would or would not have been safer. Well, you could have gone on the vessel and had someone, an expert witness, go examine the vessel and offer expert testimony as to whether it would have been safer. Perhaps. Maybe you could have gone down there and found it was, you know, covered with rubber foam to prevent injury to passengers. Well, you know, that's interesting, Your Honor, because that part of the case was developed in some bit. Okay? There was testimony that the seats below were simply what they called school bus seats, ordinary little benches without seat belts, without anything else like that. It's an older boat, and it's not one of the new, big, modern, fancy boats, but that's how the boat was. It was not a super padded, super protective, we're going to take care of everybody to the highest degree possible. We're going to take care of our passengers. Well, I wouldn't say that. We do take care of our passengers. We provide them with a place, and we are taking out roughnecks out there. We're taking guys who do this, and it's not exactly analogous, but I know that Judge Jolly wrote an opinion not that many years ago dealing with an EEOC case where somebody was being called various and sundry names for not being manly enough, and that was the Bow Brothers case, EEOC versus Bow Brothers. They were really stretching. We lost that in bank. That was an interesting one. But what we really have here, and I wasn't at the trial, to be honest with you, but we did have a gentleman who simply did not want to appear not to be manly enough by going below. Every time this man went out on a crew boat, he was in the wheelhouse. All the 30, 40 years he'd been doing it, he was in the wheelhouse. That's where he stood. That's where he went. So sissies went below. If you went below, you were a sissy. Sissies went below. Sissies went below. But he had always been in the wheelhouse. That's just where he was. That was normal to him. And he said he was actually in the wheelhouse for a specific purpose, which is important, too, because he said, I'm in the wheelhouse so that I can look and help find the place I'm going. I want to see the jackup barge that I'm going. Well, but this is on the way back. He didn't need to be in the wheelhouse to look to see where he was going. Well, no, that would be true. He didn't have to be in the wheelhouse. I want to ask you about the medical expenses that were written off. In looking at the district judge's opinion at page 9, in the record excerpts under the subheading write-offs, Part B, the judge begins with the sentence, a plaintiff cannot recover economic damages for medical fees that the provider is precluded, either by agreement or by law, from collecting from the employer. And then there's a string citation. And then she goes to economic loss. And there's no discussion or application of that rule of law, yet at the very end of the opinion she gives him all of the medical expenses, even though not all of them were paid. But you didn't move for clarification or a new trial or anything based on that omission in the opinion? We took an appeal, Your Honor. We took an appeal on that. I mean, there were so many, in our view, there were so many other areas that trying to get one little piece fixed up wasn't going to do very much. So the whole thing just came up on appeal. But do you agree? And this is a friendly question. Do you agree that by the fact of her statement of law, that it appeared she felt she had to only award the actual expenses paid rather than all of the medical expenses? Absolutely. Your reaction was the same to mine. When I'm reading through that opinion and I got there, I'm saying, well, this is really good. And then it just stopped. It just stopped. And then she went ahead and awarded it. But the other fact that I guess is more of a question for Mr. Yarr, and that is apparently the plaintiff's brief does not address that. I mean, the appellee's brief does not address that at all. It does not address the question of $180,000 at all. No, that is correct, Your Honor. That is correct. And, I mean, there are cases we've cited. I believe we cited, it was Judge, in fact, Judge Barksdale in the Malansan case. I'm sorry, in the Manderson case. We were dealing with a maritime situation in write-offs. And it was a cure situation. The analytical approach to that case was there's maintenance and cure in a seaman type of situation. This man was not a seaman but still a maritime case. And we had longshore insurance, which is a no-fault provision of medical care on an injury. It is analytically identical to a cure situation where fault is not an issue if you're injured during the course and scope. You get that paid. And in the Malansan case, of course, there was no recovery for the write-offs. Of course, the distinction is the maintenance and cure is by the boat, by the employer, and that's what I think Judge Barksdale wrote about the implied contract for maintenance and cure. Here we're talking about a third party who is not responsible for the worker's compensation or maintenance and cure. It seems to me that despite how many injuries there have been on boats, no doubt, in situations like this, there's not much settled law on the collateral source rule applicable to this kind of situation. And what we do know from maritime law general principles is we want uniformity. I don't know how we get there. That doesn't mean we apply the majority rule in the states, land-based collateral source rule. How do we answer this just as a generic question? How would you say we should answer this under maritime law seeking uniformity? We definitely need to answer it in your favor, I have no doubt. So I'm not sure you're going to give me an answer that I will feel is completely comprehensive. But just what tools should we use to figure out what a uniform rule should be for collateral source, third-party injuries such as – third-party responsibilities such as here? Well, in this scenario, Your Honor, I think that you're on the right path here. I mean the maritime concept pulls it off of the land base into the sea. In the sea law, the law of the sea has always been you get what you've actually lost. You get compensated for your actual loss. I don't want to use the phrase, but really overly generous duplicative or extraneous compensation. So in the cure situation, if the cure was paid, you don't get the amounts that the medical providers bill to your cure provider. You get the amount paid by your cure provider. In Louisiana, we've gone recently in the Hoffman decision going down that path too. We've also got Medicaid decisions where basically the collateral source – we're not saying there's not a collateral source recovery. We realize that medical bills were paid and should be paid. So we're not trying to say there's no collateral source component here. What we are saying is that the amount to be recovered is the amount actually paid on your behalf. This is not the injured party paying for the insurance. It's a third party. But the medical bills – I think we all know medical bills that are issued by the healthcare industry these days are sort of random. But they all have agreements with the various insurance companies and various other providers that they will charge a lower amount and accept that in payment by agreement, by contract. And so that's all that they – that's all that's ever do. Why isn't it just a simple principle that the collateral source rule derives from benefits that the plaintiff earned through his policy? And the benefit that he earned through his policy is $57,000 in this case and not $225,000 or $30,000. I'm with you 100%. I'm with you on that. I know you. I mean the collateral source issue has become very problematic and it's been in many ways overly generous. This is not something where the plaintiff himself paid a premium. But his bottom – I mean the whole argument is bottomed on the fact that he is entitled to recover from another source the amount that the insurance company paid because he had paid for that insurance as an employee of the company. And so he gets his $57,000, which is the benefit of his bargain. Right. And that's all he gets. The rest of it was not the benefit of his bargain. I would tend to agree with you, Your Honor. But, you know, the case law on – I hope you would agree. No, I mean I do. I do. I absolutely do and I've been doing that for years because – And PEI is subrogated to the amount of 57. He is subrogated to that and that's part of – there's a stipulation of the record. And the plaintiff is seeking to recover the balance. The balance of the billed amount. Right. He didn't pay for that. Based on some argument that he had paid for insurance or he worked hard or something. Well, the argument is that his employer retained some money from his compensation to pay the compensation premium, which, of course, is illegal. And on that, Your Honor, I see my time is up. Thank you, Mr. Schwartz. Thank you very much. Mr. Garland. Good morning, Your Honors. Have you just dropped this whole business about the collateral source rule? I'm sorry? I'm asking you. Yes, sir. Have you just dropped this whole business about the collateral source rule that you're entitled to $180,000? Did – Or have you just dropped it? No, sir. No, sir. Why didn't you say anything about it in your briefs? I thought we did. We addressed the collateral source rule in our brief, Your Honor. I thought you said nothing about the $180,000. I thought – The appeal by Bozovic was essentially that the court erred in applying the collateral source rule. And we addressed that. We felt that the court was correct in applying the collateral source rule in this particular case. In this particular case – Well, how do you jive your client receiving all of the medical bills, even though not all of them were – not the entire amount was paid? How do you make that consistent with the court – the district court saying a plaintiff cannot recover economic damages from medical fees that the provider has precluded either by agreement or by law from collecting from the employer? How is that consistent? And that's all she says. She never mentions it again. The collateral source rule – workers' compensation benefits have historically been considered a collateral source. That the tort fees should not benefit because of the patrimony or benefits or insurance that have been purchased, say, by an employee. The cases that were cited by the defendants in their brief essentially all dealt with Jones Act segment, where the employer and the employee were one and the same. And in this particular case, while the employer, PEI, essentially has a statutory right to recover what they've essentially paid in the way of medical, Mr. DePerdil was responsible for some of the bills that actually – maybe not all of the bills, but some of the bills that were actually not paid at the time that the case was actually tried. Now, while the – What are you saying?  There were some bills, and I can't recall off the top of my head, Judge, I want to say there were some bills that Mr. DePerdil actually had paid out of his own pocket that he was responsible for. The employer didn't – Did you put on evidence of that at trial? I think we did, Your Honor. What do you mean you think you did? Did you? If I recall correctly, I think there was some testimony by Mr. DePerdil to that effect. For what amount? It was a minimal amount, Judge. It wasn't the majority of the amount. Why should the defendants benefit from the insurance that Mr. DePerdil, the 25% that Mr. DePerdil took out of his paychecks to pay for this insurance? It's not a double recovery for Mr. DePerdil. He still has to pay back the workers' comp carrier for all of the medicals. I understand, but that's the whole point. He does get the $57,000, right? No, it's $57,000. I mean, he can – up to – maybe I'm wrong, but up to $57,000, he can recover that under the collateral source rule, right? Yes, sir. Okay. And then what he can't recover is what no one ever charged him for. Oh, he was charged for it. He just wasn't responsible to pay it. Yeah, but okay, and as I understand what you said in those collateral source rules, these – the factual situation we're talking about here is that it exists on the grounds that he is entitled to collect from a collateral source the amount that was paid on his medicals because he earned the insurance policy that paid for his medicals. Therefore, he's entitled to $57,000. He's not entitled to anything more because that was not part of his bargain. Well, Judge Joe, as you and – I forget who the other two justices were in the Phillips decision – actually stated that – You're going to throw back something I've said before? Yes, sir. That contradicts what I've said now? Well, to a certain extent. But in the Phillips versus Western Company of North America decision, of course that was a Jones-Zach Seaman situation, Your Honor. And in that particular case, you held that the employer is compelled to pay the benefits regardless of whether it was negligent or not. In return, the employer takes a lien for the total amount of benefits paid on any judgment or settlement the employee may later obtain. Accordingly, the injured employee is fully but not doubly compensated. In this particular case, this was the issue on collateral source in that case. The tortfeasor pays for the injuries for which it is responsible, and the employer recovers so much of its workers' compensation payments as is attributable to the tortfeasor's negligence. But in that particular case, the client is not being doubly compensated. And, of course, you know, the Bosevic's appeal was not that the judge awarded the medical write-offs. The argument was that the judge erred in applying the collateral source rule. And I don't believe that Judge Minaldi erred in applying the collateral source rule. Clearly, workers' compensation benefits are collateral source. But the $57,000. I understand that. I mean, it's clearly from a collateral source. Correct. So he can collect that against the captain as well as having his insurance paid, all of his injuries paid, by the employer's policy, right? He can get the $57,000. Should. Should get the $57,000. I mean, that is not double recovery. No one is arguing about double recovery. And I guess what your question is, Judge Jolly, is, you know, should the plaintiff get the benefit of the medical write-offs? That's a simple question. That's right. At least with regards to that. Yeah, that's one way to say it. Should the plaintiff get the benefit of the medical write-offs? Why shouldn't he? Why should the defendants get the benefit of the medical write-offs? Because the bargain he struck was for the insurance coverage. That's what he paid for, insurance coverage. He got insurance coverage. He paid years and years and years. For insurance coverage. For insurance coverage. And he got covered. He suffered no damages as a result of his injury, as far as employers. But again, under the collateral source rule, why should the tortfeasor benefit to the detriment of the plaintiff who's actually paid those premiums for all those years for those benefits? Counsel, you're making... Your Honor, although the write-offs resulted in his only paying $57,000 in medical, his employer paying $57,000 in medical, he should get the whole $140,000 or $180,000 or whatever the amount was because why should the employer get the benefit? Why shouldn't he? He's paid insurance all these years. Was that issue even presented to the district judge or evidence presented? Judge Barksdale, I don't believe that that particular issue was presented at trial. I think that the argument was made at trial that there was a certain amount. Of course, at trial, we introduced the medical records as to what the total medical expenses were, what was actually paid by workers' compensation, what was their lien, that's still outstanding, what were they entitled to. But I don't think that that particular argument was actually made. I know that some of that testimony was asked in some of the medical depositions that were actually introduced, I believe, into evidence at trial. But that particular issue, I don't think, was addressed, Judge. Counsel, my question has to do with the general concept of collateral sores. It does seem to me, obviously, that rule exists. It exists in maybe all the states or a vast number of the states. What we're talking about here is sort of the desirability of applying it in an area that does not yet have that rule well developed. I know. And so that makes, perhaps, the policy somewhat relevant here. I mean, the rule has its defenders. You're one of them, for obvious reasons, and certainly its critics. But it does serve some purpose that we're not here challenging insofar as where it applies so far. But it seems to me it would be an extension to apply it here. Maybe we should, maybe we should not. I was asking opposing counsel a while ago that maritime law, one of the guiding principles is to seek uniformity. Yes, sir. Are stating a rule here might or might not be the start of some sort of uniformity? So it does seem to me that we have in play what is the right rule, absent any controlling law. Is that a fair statement, that we have no controlling law here? It's an important issue. Not just as important, but there's nothing binding us. I understand that. I'm asking you that. Is that correct? Correct. There's nothing. Nothing except for reason. There's nothing binding us. Well, like I said, nothing binding us. Yes, sir. University of Texas. That's correct. Judge, I would like to address just some of the arguments that were raised about liability as well, if it pleases the court. By the way, my name is Joseph Garr, Your Honor. I'm here representing Mr. DePerdil. Yeah, but what did I say? We just dove right into the arguments before I even could introduce myself. Oh, I see. Well, you've been introduced on paper. Well, I am here. We're pleased to have you here. Well, I'm pleased to be here, Judge Jolly. It's a beautiful campus. It really is. I was impressed driving in. It's one of the cleanest campuses I think I've ever been to. Play into the audience. Play into the audience. Oh, I'm not. Well, I'd say I'm a Tiger fan, which I am. But just addressing some of the issues that were brought up, Your Honor, on the liability. There was no question at trial, you know, who was responsible for this boat. This man, Mr. Boesvecht, who actually owned this crew boat, was a 44-year seaman. He was a 20-year licensed captain. He had owned and operated this particular vessel, this small, because this is a small vessel. This small vessel that our expert testified at trial was never meant to be taken into offshore waters. He didn't check the weather. He was impeached at trial. In his deposition, he said, No, I never checked the weather. At trial, he says, Oh, yeah, I watched the TV twice, the night before and the morning of, to look at the weather. He didn't run his – he didn't operate his – I mean, I know, but that doesn't seem to be – that's not really an issue here. It's not, but – and I'm sorry, Judge, I don't mean to cut you off. I don't mean to cut you off. It's not. It's just one of a multitude of things that led up to the accident itself. And the argument that we made at trial was that this was operational negligence on the part of Captain Boesvecht. You know, the defendants – Boesvecht's argument was, well, he should have looked out the windshield and seen the weather. Yes, Mr. DePardieu was an offshore worker. You know, but – and I just thought of this just sitting here. You know, what if this had been a helicopter? You know, these offshore workers go back and forth to these platforms. As I understand it, the essence of his entry and the essence of the case is, your expert testified, he charged into the wave. Right. And he miscalculated all that, and that is when the boat hit a vacuum. Right. And that's when he failed and hurt himself. Well, I'm not sure what – So it was a professional mistake, operational mistake. Operational negligence, yes. And that's what your expert testified, and there was no expert on the other side, was there, that testified contrary to that? There weren't any experts that the defendants called except for a medical expert. So that's your case right there. Yes, sir. And then the only point was, as far as the 90% negligence is concerned, whether any of the contributing factors to the entry, such as holding on tight or not grabbing on or going down or whatever, might have militated against the entry. Yes, sir. That's the question. Right. So what? Well, and again, like I said, the argument that was made at trial with Judge Minaldi, and I'm not sure what Judge Minaldi's experience is offshore. You know, I live on the Gulf Coast, and so, you know, I go offshore and fish a lot. I'm not sure what your judges' experiences are offshore. But every boat's different. You have bigger boats, you have the more modern boats with the big, softer cushions in the passenger area, the seating in the passenger area. This was a little, small crew boat that went out in eight-foot seas with 25 to 40-knot winds, and the person who was in the best position to be able to identify the conditions and the handling characteristics of that particular boat was Captain Bozovec. It was not my client. There was no finding of negligence on going out at all, correct? I mean, Judge Minaldi didn't say that one of the three pieces of negligence that she identified, and one of them was not that he should never have gone at all. It wasn't. That was one of the arguments that we actually made at trial, was that he probably should have never gone out there in the first place. So we don't have that finding. We're not looking into whether or not they were on that. She didn't find that. So what we're looking at are three breaches. One of them is not checking the weather, and you seem to have said just a little while ago that that's not really the significant part of this case. Not checking the weather, because actually going out there, Captain Bozovec said that he knew the winds were 25 to 40 knots because he could see it on his, and I forget what the instrument's called, on his boat. So he's fully aware of the weather, and however he checked it was not negligence, it seems to me. Well. He was aware of the weather, and whether he got it from NOAA or whether he got it from looking out the window, he knew what the weather was. It seems to me the principal negligence is how he addressed those waves. Yes, sir. On the return. Should he have told your client to go below beforehand is a separate part, but that seems problematic, and you can address that if you want. But how he addressed the waves. Is it undisputed that there was, to use the alarming phrase of a friend on the other side, a rogue wave? Is that accepted that he was going, that the captain was going over certain waves, and then a wave coming from a somewhat different angle, higher than the rest, is what caused the injury? What caused the injury was the operation of the vessel. Let me ask, is it accepted that there was another wave coming at another angle? Was that, in the facts, undisputed? No. The waves were all coming at the same angle. It was the position that the captain put the MV Thunderstar in, which that and the fact that he was throttling down, full throttle, full throttle, pull back, full throttle, pull back. Isn't that what your expert said should be done? No. Go full throttle up, you pull back going down? He said he was not there. That, you know, it just depends on at what point you're doing it. But what Captain Bozovic chose to do was he went full throttle and he went over the wave. Mr. DePerdil, as well as the deckhand, and I forget his name, testified that actually when the boat went over this wave, they both were levitating when it came down and they couldn't hold on. And basically Mr. DePerdil hit his tailbone on the middle seat in the wheelhouse and fell to the floor. But again, it was the operational negligence, because after the accident Captain Bozovic chose to idle the vessel for 15 to 20 minutes. What was the rush? There was no rush to get back in. He idled the boat for 15 to 20 minutes back to the little bayou that they had come out of with no incident. In fact, the deckhand testified that it was a smooth ride all the way back. There was no reason to give that vessel full throttle in those oncoming six to eight foot seas. Judge, I see I only have three minutes and I'd like to address the age 75 issue if I could. Sure. Is that okay? Sure. Let me start by saying that my sweet father passed away in June. And he was 77, almost 78 years old. And he worked up until the day he passed away. And in today's day and age, most people, I believe, work as much as they possibly can because of financial reasons they have to. And some people just want to work because there's no reason to sit at home. The argument that was made by Bozovic that the court erred in not going with the Bureau of Labor Statistics, which is merely advisory, it gives the court or the trier of fact an average, a statistical average is what it is. And I read the Bartow decision. I read the Madore, I think I'm pronouncing it correctly, decisions. And while I understand that there are other, you know, that generally that statistical, you know, that the Bureau of Labor Statistics should be used, that there are other things that the court can rely upon in deciding future work-life expectancy for an individual. And at the trial of this particular case, we called Mr. DePardell's employer, who testified that they had several other employees just like Mr. DePardell, these inspectors, who were well over the age of 75. In fact, they had a gentleman out there that was working offshore in his 80s. You know, and what we're talking about here is we're talking about the difference between three, I think it's 3.44 years. Because the Bureau of Labor Statistics work-life expectancy from date of trial was 2.09 years. And Mr. DePardell's plan was to, you know. He was in bad shape. I mean, apparently, didn't he have tubes and all? No. I mean, I read it. I didn't make it up, I don't think. Well, no, he was. He had some kind of spray that he didn't have. He had a breathing problem, right? No, not that I'm aware of, Judge. Well, he said he breathes. Well, Mr. DePardell, he passed the pre-employment physical. He testified that he never missed a day of work. He never turned down a job. His employer said that he was always willing to go out on any job. This is one of these hard-working Cajun men from Gaydon, Louisiana, that worked hard and never missed any work. And there was nothing that would have prevented him, sure, this accident, from continuing to work to age 75. Four of our Supreme Court justices are over the age of 75, some are in their 80s. You know, it's not uncommon for individuals to work beyond, say, up to age 75 and beyond. And there was no evidence put on by the defendants that there was any medical reason that this gentleman could not have continued to work to age 75. He had testified that he was in great shape. They had several other witnesses that testified at trial that he was in excellent shape and he was fully capable of doing all the activities of his occupation. And for that reason, Your Honor, we believe that Judge Minaldi was correct in awarding Mr. DePardell future wage losses. Okay, Your Honor. Thank you very much. Thank you, Your Honors. Yes, sir. Thank you. Mr. Eskewits. Thank you, Your Honors. You are correct. He has COPD and was using inhalers, and that was part of the trial court record. So he didn't have tubes, per se, but he did have some breathing problems, some lung issues. He was using an inhaler. Inhalers. The interesting thing when I read through the appellee's brief when it finally came in was I don't see what is your argument against the fact that they awarded him the extra two years until he was 75 over the statistics? I mean, it seems to me the evidence was strong enough to support him on that. Well, actually, Your Honor, the methodology espoused by Bartow and Madera is to use the average, unless there's some compelling reason to the contrary. Well, there are compelling reasons to the contrary. Actually, there is no compelling reason here. When you read what the judge based her opinion on, her opinion said, I accept what Ms. Chalfton, the counselor or therapist, whatever she was, said, and she said he would like to work until he's 75. I said, okay, that sounds reasonable to me. I would like to work until I'm 75 or 80 as well. It doesn't mean I'm going to. The reason we have the Bureau of Labor Statistics statistical analysis and the reason that the plaintiff's own expert always uses statistical analysis is because that's what you're supposed to do. So your argument is we are bound to the average age, I mean, to the average workable age that the Bureau of Labor Statistics promotes. There is a strong presumption. As this court has said, it's a strong presumption that's rebuttable, but it's a very strong presumption hard to rebut. Rebutting is not looking backward, and if you read through the Madera and Bartow cases, the reason that the statistics are the most commonly and most preferred method is because they are, in fact, future-looking and not backward-looking. The statistics say that we take the American population, and we know cold, hard reality is people die early, people get injured early, people become disabled early. And yes, there are some outliers that pull us up to the 90s and pull us up to the 80s and to the 100s. But the reason that you go to court with the average is because there is no crystal ball that can say that, well, one judge is going to be able to make it to 90 and one's going to unfortunately pass away at 40 or 55. So we don't know these things, and that's why his own expert used statistical analysis until just before the trial when the case didn't settle and he was asked to come up with an alternative. And that's what happened. But the economist said, I don't know whether the man's working to 75 or not. I just look at the statistics. The only thing that the judge based it on was Ms. Chalfin. What Ms. Chalfin said was, at trial, unquestioned, I didn't know about the COPD. I didn't know about these other conditions. I didn't know about all of this. She did not have a complete health picture on him. Counselor, you don't have much time. Would you mind addressing the negligence issue that I was asking and opposing counsel on? What is the way you would respond to this is simply a matter of fact finding that the captain was negligent in how he addressed these waves and caused the injury? Three waves. Three waves. And what the plaintiff's expert says is, when you're doing this, you're out there, you're the one who knows, you start getting on step with it, you find out what the rhythm of the waves is, you get on the rhythm of the waves. That's what the captain was doing. It's three waves. The business about it being 10 or 15 minutes, that's not in the trial record. It is not there. It was three waves. And, in fact, what Mr. Deccan said, what the plaintiff himself said, is he turned around and boom, it happened. There was not a chance to get into any alternate routine. It was so fast. There's a reasonable period of time to get on step, a reasonable period of time to do these things. It's just like if you have a car accident or a truck accident, you're supposed to put out your flashers and your warning cones and everything else, but you have to have enough time to get out there to do it. If you don't have enough time to get out to do it, then you haven't breached a duty. And it's the same here. He turned around three waves and the snapping of the fingers is not mine. That was Deccan's. He says, man, we turned around and boom, that happened. What Deperado said, he says, man, we turned around and you know what, hit the fan just like that. It was almost instant. There wasn't a chance. But the expert said that he should have known what to do, notwithstanding the fact that it happened within an instant. Well, the expert was kind of interesting because as he testified at trial in response to the judge's questioning, I'm not really sure what happened out there. I'm not even sure what the man was saying, so I really don't know. His expert opinion is quite suspect, which we did address in the brief, and I believe that the case I'm looking at is Vertobo v. Dow. I believe the time has just about run out. It has, it has, Your Honor. I appreciate that. Thank you. Thank you. Thank you, sir. Thank you, Your Honor. Thank you.